IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. FOREMAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

STACI L. FOREMAN, APPELLANT.

Filed August 25, 2020.    No. A-19-867.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Heather S. Colton, of Pollack & Ball, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

After a jury trial, Staci L. Foreman was convicted of possession of a controlled substance, methamphetamine. The Lancaster County District Court sentenced Foreman to 270 days in jail, followed by 12 months of postrelease supervision. On appeal, Foreman claims that the district court should have sustained her motion for a directed verdict, that her conviction was not supported by sufficient evidence, and that her sentence is excessive. She also asserts that her trial counsel was ineffective. We affirm.

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

On July 6, 2018, the State filed a complaint in the county court for Lancaster County, charging Foreman with possession of methamphetamine. Foreman was bound over to the district

- 1 -

court on that count, and on November 21, the State filed an information in which it charged Foreman as it had in county court.

## 2. TRIAL

A jury trial took place on July 11 and 12, 2019. The State's case in chief consisted of testimony from four witnesses and a sole exhibit which was received into evidence. The parties stipulated to some facts pertaining to chain of custody issues. After the State rested, Foreman's counsel moved to dismiss for failure to prove a prima facie case. The motion was denied. The defense put on evidence consisting of Foreman's own testimony and then rested. The State offered no rebuttal evidence and rested. Thereafter, Foreman's counsel moved for a directed verdict in favor of Foreman; the motion was denied. A summary of the evidence follows.

### (a) State's Evidence

### (i) Officer Jacob Wilkinson

At the time of trial, Officer Jacob Wilkinson had worked for the Lincoln Police Department (LPD) for 10 years. On July 5, 2018, at about 2:59 p.m., Officer Wilkinson received a call from dispatch directing him to an address on South 10th Street in Lincoln, Lancaster County, Nebraska, regarding Foreman, who had a warrant out for her arrest. Upon entering that building, the officer made contact with Foreman in a probation officer's individual office and placed Foreman under arrest. Officer Nikki Loos was with Officer Wilkinson at that time. Officer Loos patted Foreman down for weapons or any contraband; Officer Loos did not locate anything. Officer Wilkinson did not recall that the pat-down search included Foreman's pockets being turned out. After the pat-down search, Foreman was placed in handcuffs and escorted to Officer Wilkinson's police cruiser. Foreman was not searched again before entering the police cruiser. Officer Wilkinson transported Foreman to the Lancaster County Adult Detention Facility (jail).

Once at the jail, Officer Wilkinson informed the "jail staff" that Foreman was there on a warrant and "they" began the intake process. Officer Wilkinson did not recall the corrections officers to whom he turned over Foreman. Officer Wilkinson was present for the first part of the intake process, which entailed asking Foreman questions and having her change into "scrub attire." Officer Wilkinson went into a separate room to fill out paperwork at some point. At that time, Officer Wilkinson did not suspect that Foreman committed a crime on that same day. Officer Wilkinson was familiar with the jail policies. Not everyone who was lodged in the jail got strip searched; specific criteria had to be met and the search had to be at the request of law enforcement for a specific reason. Locating contraband on someone's person when he or she was under arrest or in custody would be one reason that the jail would have to perform a strip search of that person. Officer Wilkinson would not necessarily request a strip search in the event of bringing someone to jail on a warrant. The officer denied that he requested a strip search when he brought Foreman to the jail; there was no reason for him to request one at that time.

Regarding the intake process, Officer Wilkinson said there was a room for individuals to change clothes. Foreman was there for "just a warrant"; a corrections officer was not in the room with her to watch her when she changed clothes. But "if she had been there for a narcotics charge," a corrections officer would have been present with her when she changed. Officer Wilkinson

agreed that after an individual changes into jail clothing, his or her possessions are collected and are taken to be inventoried; the clothing goes into a "laundry bag" and then into a secure property area where a corrections officer does the inventorying of the property of all individuals coming into the jail at that time. The inventory area was separate from the area where individuals were booked into jail.

Officer Wilkinson recalled that he left the jail after Foreman had changed into her jail clothes and had been placed in a "larger room" where the intake process was to continue. About an hour after he left, he was notified that some contraband had been located on Foreman's property. Officer Wilkinson returned to the jail where he made contact with then Correctional Officer Kristy Aker. Officer Wilkinson identified exhibit 1 as an evidence bag containing a "small bolt and nut assembly" that Aker gave to him at the jail. Aker told him she located it in Foreman's property, specifically in the right front pocket of her pants, during a property inventory. Officer Wilkinson said the item was closed when it was given to him. Inside, he found a crystalline substance consistent with methamphetamine. Using a "narcotics pretest," it tested positive for the presence of amphetamines. Officer Wilkinson, leaving the suspected methamphetamine inside the item, screwed the top back on the item and placed the item in an evidence bag. Officer Wilkinson departed the jail and went to the police station where he dropped off the evidence bag to the Lincoln Police Property Unit (property unit).

*(ii) Correctional Officer Kristy Aker*

On July 5, 2018, Kristy Aker was working as a correctional officer at the jail from 2:45 p.m. until 11:15 p.m. That day, she was assigned as the "property officer" in booking. She explained that role as follows. When an arrestee comes into the intake area, his or her personal clothing is removed and he or she changes into jail-issued clothing. The personal clothing is put in a mesh bag and tied with a zip tie, identified with a property tag showing the inmate's name and the names of the "intake officer" and property officer, and the property is placed on a shelf in the "property room." The property officer would retrieve the property bag, pull up information on a computer, remove items from the bag, and inventory the items in the mesh bag.

Aker recalled that it was announced over the radio that LPD was bringing in a female arrestee. The announcement was made because a female "booking officer" had to be present to do a pat-down search. A booking officer handled the intake of a new arrestee, including asking questions of the arrestee, doing "courtesy pat searches," and changing the arrestee into jail-issued clothing. The booking officer would then take the arrestee into the "booking area" or a "side cell." On direct examination, Aker acknowledged that she said she was working as a property officer on July 5, 2018, but she said that "if a female booking officer is not present, the property officer will take over the duties of a booking officer." Aker said that she was the booking officer for Foreman on July 5. Later, on cross-examination, Aker said that a female corrections officer identified only by the name of "Brauch" may have been present at the time of Foreman's intake. Aker believed Brauch had been "still new to the facility" so Aker went out to help with the intake.

Aker conducted a pat-down search of Foreman. Aker recalled feeling something in the right front pocket of Foreman's jeans that she was wearing and finding what looked to be "a bolt and a screw." Aker agreed that exhibit 1 appeared to show what she found. When she felt that item

- 3 -

during the pat-down search, Aker took the item out of Foreman's pocket and opened it. Aker discovered what appeared to be a white crystal-like "form" and assumed it was methamphetamine. There was an LPD officer "right there" and Aker "showed it to him" and then closed the item up. Aker believed she then placed the item in an evidence bag. She left the evidence bag on a counter, saying the unnamed officer was "still" in the intake area. Aker then completed the intake process for Foreman by asking her some standard questions. Foreman was then instructed to change into jail scrubs; the corrections officers "had to do an unclothes search on her based on the charge."

Aker was familiar with the jail policies in effect in July 2018. If someone was brought in on only a warrant, a strip search typically would not have been performed before doing the intake process. However, if a corrections officer felt there was probable cause, or questions revealed admitted drug use, then a strip search would have been conducted. A strip search was not done on Foreman until after the time that the item in question was located. Aker did not recall doing the strip search and was not sure who did it.

After Foreman changed clothes, she was moved to a side cell in the booking area. Aker returned to the intake area. An unnamed officer was going to contact Officer Wilkinson to come back to the jail. When Officer Wilkinson returned, Aker made contact with him at that time and told him what had occurred. Aker turned the item containing the suspected methamphetamine over to Officer Wilkinson.

### (iii) Forensic Scientist Vicki Cowan

Vicki Cowan of the Nebraska State Patrol Crime Lab (state lab) testified that when she received exhibit 1, Cowan dumped out the contents of the small metal container and tested the contents. Cowan said that based on the results of the tests and her training, experience, and education, exhibit 1 contained methamphetamine, a Schedule II controlled substance. The methamphetamine weighed about 0.1127 grams.

### (iv) Identification Lab Specialist James Betts

James Betts, an LPD identification lab specialist, recognized exhibit 1 as an item he had processed for latent fingerprints. He was not able to find any fingerprints on the item, but that did not surprise him since the success of latent fingerprints being on a particular item depended on many factors. According to Betts, the fact that there were no fingerprints on the item in exhibit 1 did not mean that someone had not touched it.

### (b) Defense's Evidence

Foreman testified that on July 5, 2018, she was under the supervision of the probation office. She had a meeting with probation that day. She indicated that she had told probation ahead of time that she likely had a warrant out for her arrest. She indicated the outstanding warrant related to her failure to appear in court to testify as a witness in a "strangulation case" in which she was the alleged victim. On July 5, Foreman went into the probation office knowing that she could go to jail. When she was at her meeting, Officers Wilkinson and Loos came to arrest her on that warrant. Officer Loos conducted a search of Foreman while still in the probation office. Officer Loos patted her down, flipped her jeans pockets inside out, and pulled everything out of her

- 4 -

pockets. The officers removed all of the items from her pockets. Foreman was not "really" sure what happened to those items. She thought that she eventually got them back. After her pockets were emptied, they remained flipped out. Foreman had been handcuffed already. Her pockets remained flipped out the entire time that she was escorted through the probation building. She believed she was briefly searched by Officer Loos prior to being placed in the police cruiser. Officer Wilkinson took Foreman to the jail.

When she arrived at jail, Foreman entered the booking area. The corrections officer who began her intake was a female by the name of "Brauch." Foreman knew Brauch's name by Brauch's displayed nameplate. Foreman indicated that the intake process involved being asked questions and being told to remove "any other items that could possibly be in your pocket." According to Foreman, her pockets were already turned out at that time. She believed that Brauch was to her right and a male corrections officer was to her left. Foreman did not remember the male corrections officer's name. When talking to those corrections officers, Foreman did not notice whether Officer Wilkinson was still around. Foreman said her pockets were flipped out so "they didn't really, like, touch them." However, Foreman agreed that Brauch looked to see if there was anything in her pockets that had not already been removed earlier. Foreman said there was nothing in her pockets at that time.

Foreman then went into a room where she changed out of her own clothes and into jail clothes. At that point, she was not handcuffed. She indicated that Brauch was in the room watching Foreman get changed (the door to the room was closed) and that Foreman shook each piece of her personal clothing when she undressed. Foreman handed her clothing items, one by one, to Brauch who then put them in a mesh bag. Foreman denied that there was anything else in her pockets at that time. Foreman did not observe Brauch inspect her clothing. As far as Foreman knew, only her clothes were in the bag. Up to that point, Foreman had not seen Aker that day. Foreman indicated that after her personal clothes were all in the bag, Brauch went and got jail clothes for Foreman. Foreman indicated that she then would have put on the jail clothes, unsupervised. Foreman was not sure to whom Brauch turned over the bag containing Foreman's clothes.

After Foreman changed into her jail clothing, she was placed in a side cell. When the cell was opened some time later, Aker and another corrections officer were there. Foreman "just saw the [hand]cuffs and knew" that she was "getting charged." She had not interacted with Aker prior to that point on that day. Foreman was led back to the booking area. Aker told Foreman that she was being charged with possession of a controlled substance. Until she was told what she was being charged for, Foreman did not know why she was being charged. Foreman was shown exhibit 1 during trial. She said that was the first time she had seen the bolt and assembly in person, and the item was not hers. She had no idea where it came from and had never touched it.

### 3. TRIAL VERDICT, SENTENCING, AND APPEAL

On July 12, 2019, the jury returned a verdict finding Foreman guilty of possession of methamphetamine. The district court accepted the verdict and found Foreman guilty as charged. On August 9, the district court sentenced Foreman to 270 days' in jail, followed by 12 months' postrelease supervision. The sentence was to be served consecutively to any previously imposed

sentence on Foreman. Plus, the sentence of postrelease supervision was to be consecutive to any previous order of postrelease supervision. Foreman was given 30 days' credit for time served.

Foreman appeals.

## III. ASSIGNMENTS OF ERROR

Foreman claims that (1) the district court erred by failing to grant her renewed motion for a directed verdict, (2) the evidence was insufficient to support her conviction, (3) the district court imposed an excessive sentence, and (4) her trial counsel provided ineffective assistance by failing to call a certain witness, failing to obtain and offer camera footage from her intake at the jail, and not meaningfully impeaching Aker with her written report.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. RENEWED MOTION FOR DIRECTED VERDICT

Foreman claims that the district court erred by failing to grant her renewed motion for a directed verdict. A defendant who moves for dismissal or a directed verdict at the close of the evidence in the State's case in chief in a criminal prosecution and who, when the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge correctness in the trial court's overruling the motion for dismissal or a directed verdict but may still challenge the sufficiency of the evidence. *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020). The district court denied Foreman's motion to dismiss the case made at the close of the State's case in chief. The defense then put on evidence. After all evidence had been offered by both parties, Foreman moved for a directed verdict; that motion was also denied. The record shows that Foreman waived the right to challenge the denials of her motion to dismiss and her motion for a directed verdict. However, under a separate assignment of error, Foreman challenges the sufficiency of the evidence for her conviction, which we address next.

## 2. Sufficiency of Evidence

Foreman was convicted of possession of a controlled substance, methamphetamine, under Neb. Rev. Stat. § 28-416(3) (Supp. 2017), which is a Class IV felony. As relevant, pursuant to § 28-416(3), it is unlawful to knowingly or intentionally possess a controlled substance. Methamphetamine is a controlled substance. See Neb. Rev. Stat. § 28-405(c)(3) [Schedule II] (Supp. 2017).

In the context of a criminal statute, "intentionally" means willfully or purposely, and not accidentally or involuntarily. See *State v. Erpelding*, 292 Neb. 351, 874 N.W.2d 265 (2015). "Knowingly" means "willfully" as distinguished from "accidentally or involuntarily." See *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998). In other words, to commit an act knowingly, the defendant must be aware of what he or she is doing. *Id.*

A person possesses a controlled substance when he or she knows of the nature or character of the substance and of its presence and has dominion or control over it. *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017). Thus, a person need not know the exact nature of the substance in his or her possession, but instead only that the substance is a controlled substance of some kind. See *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995) (jury instruction about culpability element of possession of controlled substance statute was appropriate because State only needed to prove defendant knew pills he possessed were controlled substance). Possession can be either actual or constructive, and constructive possession of an illegal substance may be proved by direct or circumstantial evidence. *State v. Rocha, supra*.

The State adduced evidence during trial that Foreman was in actual possession of methamphetamine. Namely, the State's evidence established that on July 5, 2018, Aker was the booking officer for the intake of Foreman. According to Aker, she conducted a pat-down search of Foreman as part of the intake process and prior to Foreman changing into jail-issued clothing. The pat-down search revealed "a bolt and a screw" (exhibit 1) on Foreman's person, specifically in the right front pocket of her jeans. Aker removed the item from Foreman's pocket and opened it. It contained a white crystal-like "form," which Aker assumed was methamphetamine. Aker placed the item in an evidence bag before continuing the intake process. When Officer Wilkinson responded to a call to return to the jail, Aker gave him the item containing the suspected methamphetamine. Officer Wilkinson identified exhibit 1 as the item Aker had given him. Officer Wilkinson delivered the item to the property unit. Cowan later tested the contents of the item. Cowan testified that exhibit 1 contained a measurable amount of methamphetamine, which she said was a Schedule II controlled substance.

Further, the jury could reasonably deduce from the same evidence establishing Foreman's actual possession of the methamphetamine that she possessed the substance knowingly or intentionally, rather than accidentally or involuntarily. See, § 28-416(3) (intent element of offense); *State v. Erpelding, supra* (defining "intentionally"); *State v. Lotter, supra* (defining "knowingly"). The law is settled that when the sufficiency of the evidence as to criminal intent is questioned, independent evidence of specific intent is not required. *State v. Aldaco*, 271 Neb. 160, 710 N.W.2d 101 (2006). Rather, the intent with which an act is committed is a mental process and

may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *Id.*

Foreman asserts that Aker's trial testimony was "not credible." Brief for appellant at 20. Foreman believes that the veracity of Aker's testimony was called into question due to alleged discrepancies as stated by Aker on cross-examination and as stated by Officer Wilkinson during his testimony. Also, Foreman notes that there was no evidence of photographs of the methamphetamine itself and that Officer Wilkinson was not able to open the item (exhibit 1) when prompted to do so during trial. Regardless, the testimony of Aker, Officer Wilkinson, and Cowan sufficiently established that methamphetamine was located inside the item when seized. Foreman's arguments essentially ask this court to resolve conflicts in the evidence, pass on the credibility of Aker, or reweigh the evidence, but these are matters for the finder of fact. See *State v. Lierman, supra*.

Viewing the evidence in a light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that Foreman knowingly or intentionally possessed a controlled substance in violation of § 28-416(3).

### 3. EXCESSIVE SENTENCE

Foreman claims that her sentence is excessive. As mentioned, she was convicted of possession of methamphetamine under § 28-416(3), a Class IV felony. A Class IV felony is punishable by up to 2 years' imprisonment and 12 months' postrelease supervision, a $10,000 fine, or both. See Neb. Rev. Stat. § 28-105(1) (Supp. 2017). The sentence must include a minimum of 9 months' postrelease supervision if imprisonment is imposed. *Id.* Foreman was sentenced to 270 days' imprisonment followed by 12 months' postrelease supervision, with 30 days' credit for time served. Therefore, Foreman's sentence is within the applicable sentencing range.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Vanness*, 300 Neb. 159, 912 N.W.2d 736 (2018). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

According to the presentence investigation report (PSR), Foreman was 35 years old at the time of her sentencing. She was married. She had an associate's degree in criminal justice and wished to pursue a college degree in psychology. Foreman had not been employed since working as a lab technician from October 2014 to January 2017; she voluntarily quit that job due to having surgery and her husband supported her financially while she was unemployed.

As shown in the PSR, Foreman's criminal history includes convictions for traffic-related offenses and for driving under the influence (2010; fine and 9 months' probation, from which she

was satisfactorily released), attempted possession of a controlled substance (twice in May 2017; fines), and possession of a controlled substance (twice in September 2017). For her two prior possession convictions, Foreman was accepted into drug court. However, she voluntarily withdrew from drug court in January 2018, and in February was sentenced to a total of 270 days' imprisonment followed by 12 months' postrelease supervision. She received 98 days' credit for time served. In October, Foreman's postrelease supervision was revoked. The circumstances of those convictions were detailed in the criminal history section of the PSR. Foreman's charges for leaving an accident and failing to furnish information (2010) and possession of a controlled substance (September 2017, different than the two possession convictions discussed previously) were dismissed. The circumstances of the dismissed possession charge were included in the criminal history section of the PSR. The PSR also included the circumstances of Foreman's present conviction, as taken from an "LPD Probable Cause Affidavit."

The PSR showed that Foreman had reported she had 10 years of sobriety from methamphetamine before she started using again in July or August of 2016. She noted she had completed treatment in the past and was in treatment at the time of her sentencing in her last case. She reported that the judge would not let her finish the program. Foreman said she needed treatment more for "coping skills" than for "alcohol and drug counseling." She had attended "NA/AA" meetings in the past and did not mind them but suggested that those meetings in jail were a "'joke.'" The PSR stated that Foreman appeared to engage in minimization or denial regarding her problem with alcohol or drugs. Foreman had been diagnosed with a few mental health disorders that were specified in the PSR. On a Level of Service/Case Management Inventory, Foreman scored high risk or very high risk in the eight usual domain areas; overall, she was assessed as being at a very high risk to reoffend.

Foreman's letter to the court, dated July 19, 2019, was attached to the PSR. She restated a summarized version of her trial testimony and pledged that she would always maintain her innocence as to her conviction. She wanted to "get away from drugs" and was ready to get a job and "put this bad stuff" behind her. Among the other documents attached to the PSR was a discharge summary related to Foreman's time in an addiction treatment recovery program from August 9, 2018, until September 21. It reflected that she walked out of a treatment meeting on September 21 and did not return to the facility. Foreman's prognosis at discharge was "poor," unless she became committed to her sobriety above all else; completion of a treatment program that would help with her mental health issues and substance abuse was recommended.

During the sentencing hearing, Foreman's counsel stated that Foreman was asking for probation. Foreman's counsel understood why the court would be hesitant to offer probation after Foreman's "lack of success" in drug court and prior revocation of postrelease supervision. Foreman completed about 4 weeks of residential treatment the year prior to the sentencing hearing; she had returned to the facility during the pendency of her revocation of postrelease supervision proceedings and was willing to complete that treatment. She maintained her innocence in this case while taking responsibility for her other past issues. Foreman needed and wanted help. She had the support of her husband and family to help her comply with the structure of probation. Foreman's counsel thought that further incarceration would set Foreman back "time wise" as

opposed to providing any of the treatment, structure, and positive support that she understood she needed to comply with under probation.

Foreman spoke personally to the district court, indicating that her letter in the PSR was a reflection of her shock and frustration with how the case turned out. She suggested that she was angry with Aker's testimony, alleging that Aker lied. Foreman did not believe that incarceration would be a positive solution for her as she was a "highly adaptable individual." She discussed how she knew what she needed to do to return to being a productive member of society. She wanted to regain a state of sobriety from methamphetamine. She had completed probation in the past because she was "ready and really wanted it." She asked to be sentenced to probation because she was ready to prove that she had changed.

The district court stated it had considered the comments made by Foreman and her attorney during the sentencing hearing and all of the information in the PSR. The district court said it could not ignore the nature of the offense and surrounding facts and circumstances or her criminal history and unsuccessful participation in drug court and later revocation of postrelease supervision. It was concerning to the district court that Foreman had been terminated from an inpatient treatment program. The district court hoped that Foreman was serious about getting treatment and moving ahead in the right direction.

Pursuant to Neb. Rev. Stat. § 29-2260 (Reissue 2016), the district court found that there were substantial and compelling reasons why Foreman could not effectively and safely be supervised in the community on probation. The district court reasons for that conclusion were that: (1) Foreman had failed to comply with the prior term of probation in a recent case; (2) a lesser sentence would depreciate the seriousness of the crime and promote disrespect for the law; (3) incarceration was necessary to protect the security of the public; (4) the risk was substantial that during a period of probation, Foreman would engage in additional criminal conduct; (5) she had not led a law-abiding life for a substantial period of time prior to the present offense; (6) she had a demonstrated history of criminal activity, disregard for the law, and an unwillingness to comport her conduct to comply with the law; (7) the district court could not find that the circumstances that led to her offense were unlikely to recur; and (8) the district court could not find that her character and attitudes indicated she was unlikely to commit another crime.

On appeal, Foreman highlights certain information from the PSR. She argues that an application of the customary sentencing factors and § 29-2260(3) to this case shows there was "simply no justification for a period of incarceration rather than a probationary sentence." Brief for appellant at 30. Section 29-2260(2) and (3) set forth factors a court should consider when deciding whether to withhold a sentence of imprisonment and instead impose a sentence of probation. The district court's stated findings during the sentencing hearing, also reflected on an attachment to the sentencing order, supports that the court considered and weighed the factors in § 29-2260(2) and (3) as they applied to this case when fashioning Foreman's sentence. While the district court orally emphasized negative information from the PSR, it stated it had reviewed all of the information in the PSR. The PSR contained ample information relevant to the sentencing considerations listed in *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). The record does not establish that the district court considered anything inappropriate when determining Foreman's

sentence. We conclude that Foreman's sentence does not amount to an abuse of discretion by the district court.

#### 4. INEFFECTIVE ASSISTANCE OF COUNSEL

Foreman claims her trial counsel was ineffective. She is represented on direct appeal by different counsel than trial counsel. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Lierman, supra*. Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.*

In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *Id.* When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.*

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics. See *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013). There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions. *State v. Huston, supra*.

Keeping those governing principles of law in mind, we turn to address Foreman's claims that her trial counsel was ineffective for failing to (1) call Brauch as a witness, (2) obtain and offer camera footage from the jail of Foreman's intake, and (3) meaningfully impeach Aker's testimony with her written report.

#### (a) Failure to Call Brauch as Witness

Foreman argues that she received ineffective assistance when her trial counsel failed to call Brauch to testify as a witness. Foreman recognizes that her recollection of the events of "that day," July 5, 2018, varied greatly from the "State's version" of the events that day. Brief for appellant at 23. There was conflicting evidence about whether Brauch and/or Aker conducted Foreman's intake and how either or both corrections officers went about the intake process.

Aker testified that she was the booking officer for Foreman. According to Aker's testimony, she found the item, later confirmed to contain methamphetamine, on Foreman's person during a pat-down search and prior to Foreman changing into jail clothing. Aker indicated that because a female corrections officer had to be present for intakes of female arrestees, she went out to assist with Foreman's intake even though Aker was assigned as a property officer that day. On cross-examination, Foreman's trial attorney asked Aker whether she conducted the intake and not Brauch. Aker said that Brauch, a female, may have been present at the time. Aker believed Brauch had been "still new to the facility." On the other hand, Foreman said Brauch and a male corrections officer handled her intake. According to Foreman, when she was changing out of her own clothes, she took her pants off and shook them in front of Brauch; Foreman denied that there was anything in her pockets at that time. Brauch placed Foreman's clothing in a mesh bag. Foreman's testimony was that she did not see Aker until after she had changed into her jail clothing and had been placed in a side cell.

Brauch was not called as a witness during trial. We agree with Foreman and the State that it is not clear from the record exactly what Brauch's testimony would have been. Foreman alleges that Brauch's testimony would have shown that the "screw and bolt" item was not found on her person or in her property, and that Foreman did not "actually or constructively possess meth." *Id.* Foreman appears to suggest that Brauch's testimony would have been corroborative of the version of events to which Foreman testified. See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014) (on direct appeal, appellate court does not need specific factual allegations as to what person--who allegedly should have been called--would have said to be able to conclude that any evidence of such alleged ineffective assistance will not be found in trial record). Further, the State argues, and we agree, that the record does not show whether defense counsel had any strategic reason for not calling Brauch as a witness at trial. We find that the record on direct appeal is not sufficient to adequately review this claim.

### (b) Failure to Obtain and Offer Camera Footage From Jail of Foreman's Intake

Foreman asserts that her trial counsel was ineffective for failing to obtain and offer camera footage from the jail showing her intake. We note that during cross-examination, Aker confirmed that the intake area was not a private changing area; it was an open area where other individuals could be present. Aker agreed that there was video surveillance of that area and that, presumably, there would have been video surveillance of her finding the bolt (exhibit 1). She indicated there was not video surveillance of the area where property was inspected and inventoried. As part of her training and experience, she was familiar with where the cameras were in the jail. During his cross-examination, Officer Wilkinson said there were public areas of the jail under surveillance footage; he had not reviewed any surveillance footage of Aker finding the bolt in Foreman's pants.

Foreman points to Aker's testimony that Aker located the "screw and bolt item" during a pat-down search of Foreman while in the intake area. Brief for appellant at 25. Foreman argues "there would have presumably been [video] evidence of [Aker] finding the nut and bolt on [Foreman]" if Aker's version of the events were true. *Id.* But Foreman believes that the "intake video" would not have shown Aker finding the methamphetamine on her person, "thereby

discrediting the State's entire theory of the case." *Id.* Foreman thinks the video evidence would have therefore been exculpatory.

While the record on direct appeal does not conclusively show that there was video surveillance of Foreman's intake for her trial counsel to obtain, Aker presumed such a video existed. Our record does not establish what any video of the intake would have shown, let alone whether it would have been supportive of Aker's or Foreman's version of the events. For that reason, we also do not know whether such a video, if obtained, was not offered by Foreman's trial counsel as part of a reasonable trial strategy. We find that the record on direct appeal is not sufficient to adequately review this claim.

(c) Failure to Meaningfully Impeach Aker's Testimony<br>With Her Own Written Report

Foreman claims that her trial counsel was ineffective for failing to meaningfully impeach Aker's trial testimony with a written report. Foreman believes that Aker's testimony was "significantly different" from what Aker stated in her "written report produced at the time of the events with regard to when, where, and how the methamphetamine was found." *Id.* at 27. Foreman contends that Aker's written report stated that she found the methamphetamine while conducting an inventory of property, which Foreman says differs greatly from Aker's testimony that she found it while doing a pat-down search of Foreman during the intake. Foreman argues that her trial counsel was aware of that alleged discrepancy "yet failed to impeach [Aker] during her testimony." *Id.*

We note that, while not admitted in evidence, the PSR in our record includes a jail investigative report apparently completed by Aker on July 6, 2018. As relevant, it states that on July 5,

> I [Aker], was assigned as the property officer on second shift at the [jail]. At approximately 1545, I was inventorying [Foreman's] property when I found a bolt screwed into a nut in the front right pocket of her jeans. I unscrewed the bolt from the nut and noticed rock crystals inside. [LPD] Officer McBride was in our intake area so I showed him what I had found. He called LPD dispatch and asked them to send out LPD Officer Wilkinson who arrested [Foreman].

It appears that Foreman's claim refers to that written report.

During trial, Foreman's counsel questioned Aker about a jail investigative report which Aker recalled she had written related to this case. Questioning was as follows.

> Q Do you recall in that report that you stated that you were inventorying inmate Foreman's property and found the bolt?
>
> A That is correct.
>
> Q So, why the discrepancy between your testimony that you found it in a pat search and your written report that you found it while doing the inventory?
>
> A That was an inventory. Any time we have an item that you can unscrew or take apart, you are to do that in the intake area.

Q Why did you not include in your report that you found the bolt during a pat down search of [Foreman]?

A I can't recall why I did that or did not include that in the report[.]

Q So, it's your testimony that you found the bolt prior to her clothing being placed in the mesh bag and being zip tied shut?

A That is what I recall, yes.

. . . .

Q Is a part of your training and experience, that if you're conducting a pat search and you find an item that you believe to be contraband, then that's part of your training and experience that dictates you call that an inventory in your reporting?

A Yes. That's what I call it.

Q Do you call when you are going through an individual's property in the mesh bag, is that also considered inventory?

A That is correct.

Q But if a pat search is conducted, and there's no contraband found, how do you reflect that in your reporting?

A Well, we typically -- if there's no contraband found, we don't write a report.

Q In your intake report, do you note that a pat down [was] conducted?

A . . . [I]f there is a reason to write a report for a situation that happens in intake, then, typically, yes.

One means of attacking the credibility of a witness is by showing inconsistency between his or her testimony at trial and what he or she said on previous occasions. *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015). The trial court has considerable discretion in determining whether testimony is inconsistent with prior statements. *Id.* As a general rule, a witness makes an inconsistent or contradictory statement if the witness refuses to either deny or affirm that he or she made the prior statement, or if the witness answers that he or she does not remember whether he or she made the prior statement. *State v. Hibler*, 302 Neb. 325, 923 N.W.2d 398 (2019). It is elementary that out-of-court statements offered to prove the truth of the matter asserted are hearsay. *State v. Stevens, supra*. Thus, prior extrajudicial statements of a witness may be received into evidence for the purpose of assisting the jury in ascertaining the credibility of the witness, but unless they are otherwise admissible, they may not be considered as substantive evidence of the facts declared in the statements. *Id.*

The record shows that in response to questions by Foreman's trial counsel, Aker (1) readily admitted that in her report she stated that she was inventorying Foreman's property and found the bolt and (2) implied that she omitted in her report that she found the bolt during a pat-down search of Foreman. It is questionable that the district court would have found that Aker had made a prior inconsistent statement when she did not deny the content of her prior statement and did not say she could not remember whether she made it. See *State v. Hibler, supra* (describing what generally constitutes inconsistent or contradictory statement for impeachment purposes). Her omission of not writing in her report that she found the bolt during a pat-down search of Foreman was not necessarily inconsistent with her testimony stating that she found the item containing

- 14 -

methamphetamine during a pat-down search of Foreman. See *State v. Ballew*, 291 Neb. 577, 867 N.W.2d 571 (2015) (victim's alleged failure to tell officer that assailant had tattoos was not inherently inconsistent with his later trial testimony that assailant had tattoos). To Aker, an "inventory" referred to both an instance of finding contraband during a pat-down search of an inmate as well as searching through an inmate's property after it had been placed in a mesh bag.

To the extent that Aker's testimony was inconsistent with her written report as to the matters at issue here, she was adequately impeached when she admitted to the contradictory statement and/or omission in her written report. See, *State v. Johnson*, 220 Neb. 392, 370 N.W.2d 136 (1985) (if witness being impeached admits to prior inconsistent statement, then he or she has been impeached and further extrinsic evidence is neither necessary nor generally allowed); *State v. Jackson*, 217 Neb. 363, 348 N.W.2d 876 (1984) (if witness, not party, admits making earlier statements contradictory of his or her trial testimony, then earlier statements are not admissible for purpose of impeachment). We conclude that Foreman cannot establish that her trial counsel was deficient as to this claim and therefore this claim fails.

## VI. CONCLUSION

For the reasons set forth above, we affirm Foreman's conviction and sentence. The record before us is insufficient to review, on direct appeal, two of Foreman's claims of ineffective assistance of trial counsel; her third claim is refuted by the record.

AFFIRMED.